MILWAUKEE LIGHT, HEAT & TRACTION COMPANY, Appellant, vs. MILWAUKEE-NORTHERN RAILWAY COMPANY, Respondent.

*March 19—June 20, 1907.*

*Street railways: Electric or interurban railways: Incorporation: Statement of "business:" Eminent domain: Location of route: Conflict between companies: Priority of right: Acquirement by purchase.*

1. Secs. 1862, 1863, Stats. (1898), provide for two distinct kinds of corporations: street railway corporations and electric or interurban railway corporations; and sec. 1863a confers upon each the right of eminent domain.

2. A statement in articles of incorporation that the business of the corporation is to construct and operate street railways in a certain city "and elsewhere in the state, and to extend its lines into or through any village or town in the state," is a sufficient compliance with the requirement of sec. 1772, Stats. (1898), that the articles state the business of the corporation; and it is not necessary that the termini of the proposed road should be specifically designated or that the cities, villages, or towns through which it is to run should be named, in order that the company may have power to condemn land for the purposes of such road.

3. Where rival companies are seeking to acquire the same land for railway purposes at the same time, priority of right is, as a general rule, acquired by that company which first makes a completed location over the property; and mere priority of incorporation is immaterial.

4. A survey of a route over the lands sought to be acquired, actual staking out of the center line of the proposed road, and a decision in good faith of the board of directors to locate the route of the road upon the line so staked out with the intention to construct the same with reasonable diligence, constitute a completed location.

5. A tentative survey of a route for an electric railway line about thirty miles long was commenced by petitioner in September, 1903, the field work was completed in May, 1905, and the maps necessary for condemnation proceedings were completed January 6, 1906. On January 16, 1906, the petitioner's board of directors formally adopted the line of the survey, and on February 15, 1906, the petition for condemnation was filed. In the meantime, in October, 1905, surveys had been begun and options for right of way were being acquired by the promoters of the defendant company. Upon its incorporation, October 25, 1905, its board of directors adopted resolutions authorizing its officers to contract with one of the promoters for the acquirement of all additional rights of way, franchises, etc., for the entire line, and appropriating money for that purpose and to pay for those already secured. Pursuant to these resolutions the work was continued without interruption, and the surveys were completed and the line staked out in November, 1905, about nine miles of such line coinciding with the line surveyed by the petitioner. The options already acquired were assigned to defendant, and prior to January 16, 1906, it had acquired options covering a very large proportion of the entire proposed right of way, including all but about a mile of the nine-mile strip in dispute, and had also obtained the necessary franchises

and crossing privileges from the towns and villages on the line. *Held*, that there was no completed location by petitioner until January 16, 1906, and that although the defendant had not prior to that date secured deeds or made binding contracts to purchase the right of way, yet its acts, with the *bona fide* intention of completing the purchases and building the line, constituted a completed location, giving it priority of right as against the condemnation proceedings.

6. The fact that defendant adopted a survey which had been partially made by the promoters before the incorporation did not affect its rights. There is no statute which expressly or by implication requires the survey and staking to be done by the company itself when it is seeking to acquire the land not by condemnation but by purchase.

APPEAL from an order of the circuit court for Milwaukee county: J. C. LUDWIG, Circuit Judge. *Affirmed*.

This is a proceeding commenced by the *Milwaukee Light, Heat & Traction Company*, a street railway corporation, to condemn certain parcels of land in Milwaukee county for a right of way for an interurban line of electric railroad. The proposed line commences in the city of Milwaukee and runs north and slightly west for a number of miles in Milwaukee county, and continues in the same general direction in Ozaukee county until it reaches the city of Cedarburg in the last-named county. Four and one-half miles of the proposed line in Milwaukee county and about the same distance in Ozaukee county lie immediately east of and contiguous to the right of way of that division of the Chicago, Milwaukee & St. Paul Railway which runs from the city of Milwaukee northward through Cedarburg. The parcels of land of which condemnation is sought in this proceeding include the parcels in Milwaukee county which so adjoin the right of way of the Chicago, Milwaukee & St. Paul Railway, and it is, as to these parcels, constituting a continuous strip of the general width of seventy-five feet, that the controversy here arises. The circuit court denied the application for right of way over these parcels, for the reason that the *Milwaukee*-

*Northern Railway Company* had obtained the prior right to use the same for railway purposes, and the petitioner appeals to this court from such denial.

The facts appearing by the testimony were in substance as follows: The petitioner is a corporation organized in December, 1896, under ch. 86, Stats. (1898), for the purposes, among others, of constructing and operating street railways for the transportation of passengers and freight in the city of Milwaukee and elsewhere in Wisconsin, and extending its railways to adjoining towns, and building and operating street railways in any village or town or from one village or town into or through any other village or town. The respondent is a corporation organized October 25, 1905, under said ch. 86, for the purpose of constructing and operating "an electric railway for the carriage of passengers and all kinds of property, . . ." in and between the cities of Sheboygan, Milwaukee, Fond du Lac, and any neighboring towns, villages, or cities. In September, 1903, the petitioner was operating a number of interurban electric lines radiating from Milwaukee, and on the 8th day of said month its board of directors passed a resolution authorizing the president and general manager (Mr. Beggs) to have surveys made and procure the necessary right of way and franchises for the construction of a railway line to Cedarburg and Port Washington by such route as in his judgment might be most advantageous and desirable. Under this resolution Mr. Beggs caused surveys to be made of a line from North Milwaukee to Cedarburg and Port Washington. These surveys were commenced in September, 1903, and were continued and finally completed May 4, 1905, but the maps were not completed until January 6, 1906. These surveys located the line over the strip now in controversy in both Milwaukee and Ozaukee counties, and stakes were driven marking the center line of the proposed road. On the 16th day of January, 1906, the petitioner's board of directors met in New York City and adopted a formal resolution adopting the line so

staked out and locating its route over the strip in controversy. in both counties. No franchises from town boards had been obtained at this time. Right-of-way agents had been sent out from time to time to obtain options of purchase from the owners of the various parcels of land included in the strip in both counties, but these efforts failed because the prices asked were deemed exorbitant, save in the case of five tracts in Ozaukee county aggregating about four fifths of a mile in length. Options on these tracts were secured in April and May, 1905, and expired in one year. Mr. Simmons, the petitioner's superintendent of construction, testified that while the surveys were progressing he endeavored to get farmers to contribute the right of way, that he told them that it would hurry the building of the road if the right of way were contributed, and that he may have told some of them that the line would be built when they gave the right of way; but he denied that he stated to any one that the road would not be built unless the right of way were contributed. Mr. Theirman, a merchant and real-estate dealer of Thiensville, Ozaukee county, called on Mr. Beggs some time in 1904 and inquired upon what condition the company would build the line, and Mr. Beggs told him that if the citizens would get the right of way and give it to him he would build the line. In or about October, 1905, Mr. Theirman again called on Mr. Beggs concerning the matter, and Mr. Beggs stated to him that they would build the road when they got ready. After the passage of the resolution of January 16th the present petition, seeking to condemn so much of the proposed right of way as is situated in Milwaukee county, was prepared, and on the 15th day of February, 1906, the same was filed, and upon the following day notice of the pendency of the proceedings was filed in the proper office. The foregoing facts are practically undisputed, and they constitute substantially the facts relied on by the petitioner in support of its right to condemn.

On the part of the respondent the following facts ap-

318    SUPREME COURT OF WISCONSIN. [June

Milwaukee L., H. & T. Co. v. Milwaukee-Northern R. Co. 132 Wis. 313.

peared: The Comstock-Haigh-Walker Company (hereafter called the construction company) was in March, 1905, a Michigan corporation organized for the purpose of constructing and operating electric railways, and of the company Mr. F. W. Walker was a director and apparently the active manager. Early in March, 1905, Mr. Walker, Mr. Haigh, and Mr. Comstock, representing the construction company, had conceived the idea of constructing an electric railroad from Milwaukee northward to Cedarburg, Port Washington, Sheboygan, West Bend, and Fond du Lac. In the latter part of March they went over the ground and noticed the advantages of locating the route on the strip in dispute in both Milwaukee and Ozaukee counties. About the middle of October, 1905, two surveying parties were started out by the construction company, one from Sheboygan going south and one from Cedarburg going south to Milwaukee. These parties, under Mr. Walker's direction, located the proposed line by stakes as they went along, and completed the survey over the line from Cedarburg to Milwaukee and on the disputed strip in the latter part of November, 1905. While these surveys were progressing Mr. Walker noticed some of the stakes set by the petitioner near Cedarburg and was informed that they were set by Mr. Beggs, of whose official relations to the petitioner he was informed, but he paid no attention to them except to inquire of the officers of the cities of Port Washington and Cedarburg and of the village of Grafton and town of Mequon whether any application for franchises had been made to such officers, and was informed that there had been none. During the progress of the surveys option contracts were rapidly secured from the owners of the various parcels of the contested strip in both counties for a right of way sixty-six feet in width. The options all provided that the land was to be used for the purpose of the right of way of an electric railway company and might be assigned by the grantee for such use. Those executed in

October were executed to Mr. J. M. Saeman, of Sheboygan, Wisconsin, who had become associated with the construction company in the enterprise, while those thereafter executed ran to the *Milwaukee-Northern Railway Company.* Fifteen of these options, taken between October 15th and October. 24th, cover lands on the disputed strip in Milwaukee county. Three others, taken in January, cover parcels of the same strip in Milwaukee county. Twenty options, taken in October, cover lands in the disputed strip in Ozaukee county, while one other was taken in November and two in January, 1906. The option contracts so acquired prior to January 16, 1906, covered a very large proportion of the respondent's entire proposed right of way from Milwaukee to Port Washington, and over the disputed strip the option contracts covered all but a mile. Many other options were secured after January 16th upon parts of the right of way not in dispute. The respondent corporation was duly organized under ch. 86, Stats. (1898), October 25, 1905, with 1,000 shares of capital stock of $100 each, 993 of which were taken by the construction company and seven by individuals who became directors of the corporation. Mr. Walker became the vice-president and active manager of the corporation, twenty per cent. of the stock was at once paid in, and a meeting of the stockholders was held and directors were elected. A meeting of the board of directors was immediately held and the following resolutions were adopted:

"*Resolved,* that pursuant to authority this day vested in this board, a contract be entered into between the *Milwaukee-Northern Railway Company* and the Comstock-Haigh-Walker Company, providing for the acquirement of all additional rights of way, privileges, franchises, and other rights necessary for the building of the company's proposed line of electric railway, and also for the complete construction and full equipment of said proposed line running from the city of Milwaukee to and through Cedarburg and Port Washington into the city of Sheboygan, with a branch line running

northwesterly from Cedarburg through West Bend and into the city of Fond du Lac; that said contract be negotiated by the president, secretary, and treasurer of the company, and reduced to writing and submitted to the board for approval at a later meeting; that said contract be upon such terms and for such consideration as said officers deem expedient and right; and that until said contract is approved by this board and duly signed and entered into, said officers be authorized to arrange with said Comstock-Haigh-Walker Company to continue the work of securing the necessary rights, franchises, and private rights of way for the use of the railway upon terms to be by them agreed upon.

"*Resolved*, that the proper officers of this company be and they are hereby authorized to pay over to the Comstock-Haigh-Walker Company upon vouchers duly itemized and approved, out of the funds of this company, a sum not exceeding twenty thousand dollars ($20,000) for the rights of way already secured for the company and on account of disbursements and for services in procuring additional rights of way and franchises and for services and disbursements in the matter of the organization of the company and the procurement of its charter and other rights."

The active work of surveying and staking the route and obtaining options proceeded uninterruptedly after this meeting as before, under charge of Mr. Walker, who had frequent consultations with the directors of the respondent company and acted in accordance with their conclusions but without any regular meeting. The options which had been procured in the name of Mr. Saeman were duly assigned to the respondent company November 10, 1905, but not recorded, and all further options secured were taken in the name of the respondent. The $20,000 referred to in the resolution was paid out from time to time as necessary in paying for options and deeds of right of way, but at what precise times does not appear. No deeds were secured prior to January 16th, but between that date and before February 15th thirty-one deeds and one release of tenant's rights covering parcels in the disputed strip in Ozaukee county, and twenty-

two deeds covering parcels in the disputed strip in Milwaukee county, had been secured, all running to the respondent as grantee, and all containing a clause that the land is to be used for right-of-way purposes for an electric railroad. The Ozaukee deeds were all recorded February 16, 1906, and the Milwaukee county deeds were recorded February 17th, with the exception of four which were recorded February 20th. These deeds covered all but two parcels of the contested lands in Milwaukee county and all but six parcels (on five of which the petitioner had options) in Ozaukee county.

In October, November, and December, 1905, the respondent obtained all the necessary franchises and highway-crossing privileges from the villages and towns through which the line from Milwaukee to Port Washington runs to enable it to construct and operate the entire line, except in the city of Port Washington and city of Milwaukee, and these latter franchises were obtained on the 2d of January and the 22d of March, 1906, respectively. December 15, 1905, Mr. Walker and Mr. Haigh, treasurer of the respondent, had an interview at New York with Mr. C. W. Wetmore, one of the directors and executive officers of the petitioner, and informed him of their projected road and its route as well as of the options and franchises they had obtained, and asked for a contract giving the respondent the right to enter the city of Milwaukee over the petitioner's tracks, but this was refused.

The petitioner had obtained no franchises or highway-crossing privileges outside of Milwaukee and North Milwaukee on January 16, 1906. The respondent had done no grading or other work of physical preparation of the route necessary for the construction of the road prior to the filing of the petition herein, but in April, 1906, work of grading was begun on other portions of the road north of the disputed strip, and at the time of the trial in June, 1906, nearly ten miles had been graded and the work was actively progressing. At the last-named date, also, a power-house site

had been purchased in Port Washington, materials consisting of bridges and rails had been purchased, many options secured on the Sheboygan and Fond du Lac lines, and $124,000 in cash had been expended by the construction company, besides liability incurred for material to be delivered, amounting to $75,000, in addition to the cash expenditure.

Upon these facts the court found that the surveys made by the petitioner in 1903, 1904, and 1905 were tentative only, and that petitioner had no fixed intention to build a road over the route until the 16th day of January, 1906, when the route was fixed and located by resolution of the board of directors; that by virtue of the surveys made by the construction company and the resolutions of the directors of the respondent company passed October 25, 1905, and the subsequent acts of the construction company and the officers of the respondent, the route of the respondent's main track was in good faith actually located and fixed over the disputed strip prior to December 1, 1905, with intent to build thereon; that by this prior location in good faith the respondent had, in effect, appropriated the disputed strip for railway purposes before the commencement of these condemnation proceedings; and hence that the petitioner was not entitled to condemn any portion of the strip in controversy.

*Clarke M. Rosecrantz,* for the appellant, contended, *inter alia,* that by priority in time of location the petitioner acquired priority of right. Baldwin, Am. R. R. Law, 108; 2 Lewis, Em. Dom. (2d ed.) § 306; 3 Elliott, Railroads, § 927; *Barre R. Co. v. M. & W. R. R. Co.* 61 Vt. 1; *Contra Costa C. M. R. Co. v. Moss,* 23 Cal. 323, 330; *Williamsport & N. B. R. Co. v. Phila. & E. R. Co.* 141 Pa. St. 407, 414; *New Brighton & N. C. R. Co. v. P., Y. & C. R. Co.* 105 Pa. St. 13; *Washington & I. R. Co. v. C. D'A. R. & N. Co.* 160 U. S. 77, 100; *Rochester, H. & L. R. Co. v. N. Y., L. E. & W. R. Co.* 110 N. Y. 128; *Chesapeake & O. R. Co. v. D. R.*

*Co.* 57 W. Va. 641, 50 S. E. 890, 900; *Weidenfeld v. Sugar Run R. Co.* 48 Fed. 615; *Pittsburg, Va. & C. R. Co. v. P., C. & S. L. R. Co.* 159 Pa. St. 331; *Kanawha, G. J. & E. R. Co. v. G. J., L. L. & D. W. R. Co.* 45 W. Va. 119; *Schneider v. Knickerbocker Ice Co.* 119 Wis. 171; *In re Milwaukee S. R. Co.* 124 Wis. 490, 497. No location of the route of defendant's proposed road was ever made by its *board of directors.* Sec. 1846, Stats. (1898); *Kavanaugh v. Wausau,* 120 Wis. 611, 616; *Cammeyer v. U. G. L. Churches,* 2 Sandf. Ch. 186, 229; *United B. Church v. Vandusen,* 37 Wis. 54; *Filon v. Miller B. Co.* 60 Hun, 582; *Baldwin v. Canfield,* 26 Minn. 43; *Johnson v. Sage,* 4 Idaho, 758, 44 Pac. 641; *Kansas City H. P. Co. v. Devol,* 72 Fed. 717; *Schmidt v. Densmore,* 42 Mo. 225; *York & C. R. Co. v. Ritchie,* 40 Me. 425; *Emerson v. Providence H. Mfg. Co.* 12 Mass. 238; *Manchester & L. R. Co. v. Fisk,* 33 N. H. 297; *Caldwell v. Mut. R. F. L. Asso.* 53 App. Div. 245; *Lyon v. Jerome,* 26 Wend. 485. See, also, 10 Cyc. 770–774. The petitioner was entitled to condemn any premises not appropriated to a public use prior to the time of its location, January 16, 1906. *Peoria R. Co. v. P. & S. R. Co.* 66 Ill. 174; *Phila., G. & N. R. Co.'s App.* 2 Walk. (Pa.) 291; *In re Rochester W. Comm'rs,* 66 N. Y. 413; *Suburban R. Co. v. Met. W. S. E. R. Co.* 193 Ill. 217.

For the respondent there was a brief by *Winkler, Flanders, Bottum & Fawsett,* and oral argument by *F. C. Winkler* and *C. F. Fawsett.* They argued, among other things, that the adoption of the strip in controversy as a part of its right of way, and the location of its road upon it, was in fact made by respondent before the attempted adoption by appellant of the same strip. Helliwell, Stock & Stockh. § 251; *Hoyt v. Thompson's Ex'r,* 19 N. Y. 207; *Black River Imp. Co. v. Holway,* 85 Wis. 344, 354; *Detroit & T. S. L. R. Co. v. Campbell,* 140 Mich. 384, 387, 103 N. W. 856, 857; *Wood v. Whelen,* 93 Ill. 153; *Schneider v. Knickerbocker Ice Co.*

119 Wis. 171, 175; *Sioux City & D. M. R. Co. v. C., M. & St. P. R. Co.* 27 Fed. 770; *Melledge v. Boston Iron Co.* 5 Cush. 158; 2 Cook, Corp. (5th ed.) § 721; 2 Morawetz, Corp. § 629; *Bank of U. S. v. Dandridge,* 12 Wheat. 64, 70; 4 Thomp. Comm. on Corp. §§ 5063, 5303, 5312, 5327; 7 id. §§ 8430, 8436, 8438, 8443, 8444. Under sec. 1854, Stats. (1898), whenever it appears in a condemnation suit that the land sought to be condemned was acquired by another railroad company before the commencement of the suit for condemnation, the time of which, as fixed by the statute, is the filing of the petition, such land can be condemned only after the commissioners have determined the necessity therefor, and not at all if it appears that such condemnation would interfere with the main track of the railroad first acquiring such lands. As no portion of the strip in controversy can be taken without interfering with the main track of respondent's road which has been located since November, 1905, such disputed strip is not subject to condemnation at all in this proceeding. *Pa. R. Co.'s App.* 93 Pa. St. 150; *Cake v. Phila. & E. R. Co.* 87 Pa. St. 307; *Housatonic R. Co. v. L. & H. R. Co.* 118 Mass. 391; *Boston & M. R. Co. v. L. & L. R. Co.* 124 Mass. 368; *Prospect Park & C. I. R. Co. v. Williamson,* 91 N. Y. 552; *St. Paul U. D. Co. v. St. Paul,* 30 Minn. 359; *Central City H. R. Co. v. Ft. Clark H. R. Co.* 81 Ill. 523; *Hickok v. Hine,* 23 Ohio St. 523; *Pittsburgh J. R. Co.'s App.* 122 Pa. St. 511; *Phila., W. & B. R. Co. v. Williams,* 54 Pa. St. 103; *Del. & H. C. Co. v. Whitehall,* 90 N. Y. 21.

WINSLOW, J. As appears by the statement of facts, this is a contest between two corporations each seeking to acquire the same strip of land for railway purposes, the petitioner by condemnation and the respondent by purchase. Both corporations were in form organized under the provisions of ch. 86, Stats. (1898), the purposes of the petitioner, as stated

in its articles of incorporation, being to construct and operate street railways for the carriage of passengers and property in the city of Milwaukee and elsewhere in Wisconsin, and extending its railways into and through villages and towns of the state, and the purposes of respondent being to construct and operate an *electric railway* for the carriage of passengers and property in and between the cities of Sheboygan, Milwaukee, and Fond du Lac, and neighboring towns, villages, or cities.

The petitioner claimed in the trial court and claims in this court that the respondent has no power to build or operate a railway or to condemn land therefor, and that hence it cannot resist the petitioner's application for condemnation. The contention, in brief, is that our statutes recognize but two kinds of public railroad corporations, viz., a street railway corporation organized under ch. 86, Stats. (1898), and a general commercial railroad corporation under the provisions of ch. 87 of the same statutes; that the respondent corporation is not a corporation of either kind, and, if it be a corporation at all, it has acquired no power to construct or operate a railroad for the carriage of passengers or freight, nor to acquire lands either by purchase or condemnation for such purpose. On the other hand it is claimed by counsel for respondent that our statutes authorize the formation under ch. 86 of what have been called electric railway corporations, which are neither municipal street railway companies nor general commercial railway companies, and that the respondent is a company of this third class of railway corporations. The question is an important and interesting one and is now raised for the first time. Its correct solution requires a careful examination of the past and present statutes of the state concerning the formation of railroad corporations.

Prior to the year 1872 there was no general law in existence specially designed to provide for the organization of railroad corporations. Ch. 73 of the Revised Statutes of

1858 provided generally for the formation of "joint-stock companies," with the powers of corporations, for the purpose of carrying on any kind of manufacturing, mechanical, mining, or quarrying business, or any other lawful business, by the adoption of articles of agreement in writing. It is perhaps possible that some transportation companies may have been organized under this law, but the general, if not the universal, custom was to procure a special charter from the legislature for the incorporation of either a general commercial railroad or a street railroad. Companies so formed were controlled by general regulations contained in ch. 76, Tay. Stats. (1871), and street railroads were authorized to accept municipal franchises and extend their lines into adjoining towns. Secs. 93, 94, ch. 76, *supra,* being ch. 313, Laws of 1860. By an amendment to the constitution finally adopted in 1871 the legislature was prohibited from passing special laws granting corporate powers and privileges except to cities, and in 1872 general laws providing for the organization of corporations by the making and filing of articles of association were passed. Of these general laws ch. 119 provided for the formation of general commercial railroad corporations, with rights of eminent domain, and regulated their operations, but the formation of street railroad corporations was not authorized thereunder. Ch. 144 provided for the formation of corporations for business and manufacturing purposes of various kinds, excluding, however, "banking, insurance, and operating railroads," and repealed ch. 73 of the Revised Statutes of 1858, relating to joint-stock companies. Ch. 146 provided for the formation of corporations for "other than manufacturing, mercantile, insurance, banking, transportation, and trading purposes." None of these laws contained any provisions for the organization of street railroad corporations, but the provisions of ch. 313, Laws of 1860, remained in force. Thus the law stood until the passage of the Revised Statutes of 1878, with apparently no

means provided for the organization of street railroad cor-
porations. By the last-named revision ch. 144 and ch. 146,
Laws of 1872, were condensed and united, forming ch. 86, it
being provided, however, that corporations for the purpose
of engaging in banking, insurance, building, or operating
railroads or plank or turnpike roads could not be formed
thereunder. Ch. 119 of the Laws of 1872 became with
some changes ch. 87 of the revision, and still remained a
chapter authorizing the formation of general commercial
railroads only, the provisions of ch. 313, Laws of 1860, being
added at the close of the chapter as secs. 1862 and 1863. It
was evidently observed, however, that the existing statutes
were barren of any provision for the organization of street
railroad corporations, and the following new sentence was
inserted at the beginning of sec. 1862: "Corporations for
constructing, maintaining and operating street railways may
be formed under ch. 86 and shall have powers and be gov-
erned accordingly."

At this time, then, the law stood thus: General commer-
cial railroads with the power of eminent domain could be
formed under ch. 87, while street railroad companies without
the power of eminent domain, but with the power to accept
franchises from a municipal corporation to operate the cars
upon the streets, and with the consent of the supervisors to
operate them upon the highways of adjoining towns, might
be formed under the provisions of ch. 86 as modified by sec.
1862. At this time there was little, if any, thought of the
possibilities of the modern interurban railroad, and the street
railroad itself was a modest affair, depending for its motive
power on animals exclusively, and content to perform the
functions of a carrier of passengers upon the streets of a
city and its immediate suburbs. For the creation and gov-
ernment of such a railroad the legislation at this time was
apparently ample, but it contained no provisions under which
an interurban railroad corporation carrying passengers and

freight through the country from city to city could be formed; nor did it contain any provisions by which a street railroad company could enlarge the scope of its business so as to perform these functions.

By ch. 221, Laws of 1880, however, sec. 1863, R. S. 1878, was amended in a most important respect. This section as it stood before the amendment was but a condensation of sec. 2, ch. 313, Laws of 1860, and provided in substance that a street railroad company operating within any municipal corporation might, with the consent of the supervisors of any adjoining town, extend its lines into such town and use the highways thereof, provided it should not obstruct common travel of the public thereon. The amendment of 1880 made no change in these provisions, but added new provisions, upon the true import of which must depend very largely the answer to the question now before us. These new provisions are as follows:

"Corporations may be formed and governed in like manner for the purpose of building, maintaining, and using street railways with rails of wood or iron, in any village or town, or to extend from any point in one village or town to, into, or through any other village or town; and for running of cars propelled by animals, for the carriage of either passengers or freight; and for that purpose, with the consent of the board of trustees of any village, and with the written consent of a majority of the supervisors of any town, in, into, or through which such railway or tramway may extend, may lay or operate their railways or tramways upon, across, or along any highway, but not so as to obstruct the common public travel thereon."

A further clause regulated the manner in which the consent of village trustees would be given and authorized the imposition of a license fee.

It is said that these new provisions were intended merely to give additional powers to street railway corporations, but a careful examination of them precludes this idea. Had

such been the intention it would have been very easy, by the insertion of a few words in the existing section, to make the change, and make it in such a way as to make it clear that street railway companies were granted greater powers; but this was not done. Instead thereof the legislature left the provisions of secs. 1862 and 1863, authorizing the formation of street railway companies and the operation of their lines upon the streets of a city and its immediately adjoining towns, absolutely intact as before, and proceeded to enact an independent provision complete in itself, authorizing the organization and operation of an entirely different thing, namely, a rural street railway or tramway operating only in or through villages or country towns, or both, and authorized to carry passengers and freight. For these purposes the said "corporations may be formed and governed in like manner," *i. e.* in like manner to street railway corporations in a city, or, in other words, under the provisions of ch. 86. This provision is useless, and even nonsensical, if the intention was simply to endow street railway companies with the additional power to build and operate lines through towns and villages not adjoining their home cities.

Again, the corporations contemplated by this new section were authorized to build only in or through villages and country towns and not in cities at all, whereas the true street railroad corporation was by sec. 1862 expected to operate its lines in a municipal corporation and its immediately adjoining towns. If the legislature did not here intend to provide for the creation of a new sort of a railway, namely, a rural street railway or tramway to traverse only the highways of villages and country towns and carry passengers and freight, then they expressed their intentions most unfortunately and blindly. To our minds this intention seems very plain. True, this rural railway or tramway was not the electric interurban railroad as since developed and as we know it, but it was to all intents and purposes the germ of

the modern interurban railroad, and was clearly differentiated from the municipal street railroad on the one hand, and the general commercial railroad on the other.

Subsequent legislation seems to make the intent still clearer. By ch. 387, Laws of 1891, two significant changes were made in the provision under consideration. The word "street" was stricken out before "railways," and the words "or other power" inserted after the word "animals," so that it now authorized the building of railways in and through towns and villages for carrying passengers and freight, the cars of which were to be propelled by animals or other power. This industrious elimination of the word "street" from the section seems an unmistakable indication of the legislative intent to remove all cause for confounding the new railroad or tramroad with the municipal street railroad, and the addition of the words "or other power" seems an equally clear indication that the legislature realized that the electric interurban road was in sight and must be provided for. The section as thus amended was inserted without change in the Statutes of 1898, where it appeared as sec. 1863, and so remained until the year 1901, when it was evidently recognized that interurban railways must be authorized to enter and run through cities as well as villages and country towns, and by ch. 425 of the laws of that year the section was again amended so as to accomplish this purpose. This act is very significantly entitled "An act to amend sec. 1863 of the Statutes of 1898 relating to extension of street *and electric* railways into towns and villages."

It was evidently under the law of 1891 that the defendant in the case of *Chicago & N. W. R. Co. v. Milwaukee, R. & K. E. R. Co.* 95 Wis. 561, 70 N. W. 678, was organized. In this case the defendant, having obtained street franchises from the village of South Milwaukee, attempted to lay its tracks on one of the streets across the tracks and right of way of the plaintiff, a commercial railroad, and it was held

that it could not do so because it was organized to operate, not. a mere street railway, but in substance a commercial railway for the carriage of passengers and freight from city to city, and hence its tracks constituted an additional burden on the streets for which abutting owners were entitled to compensation. This case was argued February 27, 1897, but not decided until April 7, 1897. Its pendency had, however, called sharp attention to the fact that no railroad corporations, except those organized for general commercial purposes under ch. 87, possessed the power to condemn lands, and that without such power both street railways and interurban railways might be seriously handicapped, if not crippled, in their operations. To meet this difficulty it was concluded that limited powers of condemnation should be given them, and to that end ch. 175, Laws of 1897, was passed. This act provided that "any street railroad corporation or any electric railroad corporation" may by purchase, grant, or condemnation acquire lands and other property necessary for the construction and operation of its railroad within certain limitations, and applied the railroad condemnation statutes to such corporations. The wording of this act, both in its title and in its body, so clearly recognizes the existence of two kinds of corporations, the "street railroad corporation" and the "electric railroad corporation," that any serious doubt as to the legislative understanding of the subject seems to be removed. This statute was soon thereafter embodied in the Statutes of 1898 as sec. 1863a, and was abbreviated in its wording so as to confer the power of condemnation on "any street or electric railroad corporation," but there is no indication of any intention to make any change in the meaning by this striking out of words. It was evidently thought that the same meaning was expressed in fewer words. This section was subsequently amended so as to grant more complete powers of condemnation by ch. 306, Laws of 1899, ch. 465, Laws of 1901, and ch. 266 and ch. 497, Laws of 1905; but.

none of these changes affects the present question. It is common knowledge that the interurban railways which have been built in this state are all operated by electricity, and that they are popularly called "electric railroads." The legislature has evidently adopted this popular name, and has used it since 1897 to designate the rural or interurban railroad. One exception to this use may be noted, and that is in ch. 347, Laws of 1903 (secs. 1863*b–f*, Stats.: Supp. 1906), which authorizes "any street *or interurban* railway company" located in one of the border counties to consolidate with a like corporation in an adjoining county of the adjoining state. Here the recognition of an interurban railway company, as distinct and separate from a street railway company, is so manifest as to require no discussion of the subject.

It is true that some recent statutes have not accurately preserved the distinction. In one of the clauses of ch. 497, Laws of 1905, the words "electric railway" are used alone, evidently intending to cover both street and interurban roads, and in ch. 447, Laws of 1905 (secs. 4078*a*, 4078*b*, 4078*c*, Stats.: Supp. 1906), requiring the production of books and papers by the officers of railroad corporations, only railroad and street railroad corporations are named, though it is manifest that all railway corporations were intended to be included. So, also, in some of the decisions of this court, notably *Chicago & N. W. R. Co. v. Oshkosh, A. & B. W. R. Co.* 107 Wis. 192, 83 N. W. 294; *Younkin v. Milwaukee L., H. & T. Co.* 112 Wis. 15, 87 N. W. 861, and *State ex rel. Vilter Mfg. Co. v. Milwaukee, B. & L. G. R. Co.* 116 Wis. 142, 92 N. W. 546, the term "street railway" is inaccurately used as if it covered the interurban railroad. Such inaccuracies, however, can have little weight in the face of the definite statutory provisions already referred to creating and recognizing the interurban or electric railroad.

The respondent corporation was organized, under the provisions of ch. 86, as an electric railroad running from city

to city, and we hold that such organization was authorized under sec. 1863, *supra,* and the amendments thereto, and that it has the power to acquire lands for its legitimate purposes by purchase or by the exercise of the power of eminent domain.

Here we are met with a counter contention on the part of the respondent to the effect that the petitioner has no power to condemn the lands in question. The argument is that the petitioner is a street railroad corporation only, and that such a corporation has only the power to extend its lines into the towns immediately adjoining the municipality from which it has received street railway franchises under the first paragraph of sec. 1863, *supra;* that if it desired to incorporate as an interurban railway corporation it must designate in its articles of incorporation the points between which it proposes to construct its line, as general commercial railroads are required to do by sec. 1820, Stats. (1898). It is argued that in no other way can the purposes of the company be satisfactorily stated, and that as sec. 1772, ch. 86, Stats. (1898), requires the articles to state the "business or purposes" of the corporation, the articles must state the termini of its proposed road. It is further argued that as sec. 1863 authorizes the formation of such corporations to build a road extending from a point in one city, village, or town into or through any other city, village, or town, it is plainly implied that the cities, villages, or towns into or through which the proposed railroad is to run must be named, and that the legislature could not have intended to grant a roving commission to such a corporation to build a railroad in the state wherever its officers might at any time choose. The argument is not without considerable weight. We do not think, however, that the law has been so construed, and we should hesitate to give a narrow construction to a statute which is not absolutely clear in its terms at the risk of imperiling extensive interests which have grown up under a liberal or broad construction

unchallenged for years and honestly entertained. Nor do we see any necessary evils or dangers resulting from the broader construction. Were it to be held that the articles must state the termini of the proposed road, the only result would be that the corporation would be obliged to amend its articles at any time when it desired to change its route or build another line. Again, sec. 1772, *supra,* only requires the statement of the *"business or purposes"* of the corporation. The petitioner's articles state that its business, among other things, is to construct and operate street railways in the city of Milwaukee and elsewhere in the state, and to extend its lines into or through any village or town of the state. This seems to constitute a sufficient compliance with the requirement that the articles state the *business* of the corporation, and we therefore hold that the petitioner has power to extend its lines and for that purpose to condemn the property in question.

These conclusions necessitate consideration of the question of the relative rights of the parties in the disputed strip. When rival companies are seeking to acquire the same lands for railway purposes at the same time, the question which is entitled to precedence is frequently delicate and doubtful, and this is especially true when one company is seeking to condemn and the other is seeking to purchase. The general principle, doubtless, is that priority is acquired by that company which first makes a completed location over the property, and that the relative dates of the organizations or charters of the rival companies are immaterial. 2 Lewis, Em. Dom. (2d ed.) § 306. The difficulty, however, lies in determining what acts amount to a completed location, especially in view of the varying statutes upon the subject in the different states. It is frequently said that, as to third persons and rival corporations, a valid location is made by a survey and staking out of the line and the adoption of such line by the directors. *Pittsburg, Va. & C. R. Co. v. P., C. & S. L. R. Co.* 159 Pa. St. 331, 28 Atl. 155; *Chesapeake & O. R. Co.*

*v. Deepwater R. Co.* 57 W. Va. 641, 50 S. E. 890. A mere tentative survey, made to ascertain the feasibility of a route, cannot be considered a completed location, though every measurement be made and every stake driven with mathematical accuracy. There must necessarily be some decisive act on the part of the ultimate corporate authority which commits the corporation to the route surveyed before the location can be said to be completed; but, on the other hand, the corporate determination to build upon the route surveyed need not be an irrevocable determination, for the corporation may, at its election, discontinue condemnation proceedings prior to the appointment of commissioners, and with the consent of the court may do the same after commissioners are appointed and before the award is made. *Manitowoc & L. W. R. Co. v. Stolze,* 101 Wis. 91, 76 N. W. 1113. It is plain, however, that it must be a determination made with the present intention in good faith to locate the line upon that route and construct the same with reasonable diligence. It cannot file a mere caveat upon the route and await future developments. Our statute, sec. 1846, Stats. (1898), requires the petition for railroad condemnation to state, among other things, that the corporation has surveyed its route over the lands sought to be condemned, has actually staked out its center line, and that the route has been located by the board of directors upon the line so staked out. There can be no doubt that in this state these acts, taken together, constitute a complete location in the sense now under consideration, and that in case of a contest between two companies for the same location that company which has in good faith first taken all of these steps must be considered as having made the prior location.

In the present case the petitioner commenced making the survey of a line from Milwaukee northerly through Cedarburg and running over the disputed strip in September, 1903, and completed the field work in May, 1905, but did not complete the maps necessary for condemnation proceedings till

January 6, 1906. The trial court found that this survey was tentative only, and was not made with the fixed intention of establishing a railway on the land in controversy. There is certainly evidence in the case which justifies this finding. The whole line probably did not exceed thirty miles in length and presented no serious engineering difficulties. No local franchises were sought or obtained. To say that the survey proceeded with deliberation would be to pay an undeserved compliment to the activity of the engineers. Active proceedings did, however, commence in the latter part of December, 1905, apparently coincident with the discovery of active operations on the part of the respondent, and on the 16th day of January, 1906, the petitioner's board of directors formally adopted the line of the survey as the line of the road, and on February 15th this petition was filed. The decisive corporate act by which the previous experimental or tentative steps were adopted and the location in fact made by the petitioner was undoubtedly the resolution of January 16, 1906, and the question arises whether previous to this time the respondent had made a completed location over the disputed strip. The steps taken by the construction company and the respondent's officers in the fall and early winter of 1905 and 1906 are fully stated in the statement of facts and need not be repeated here. Surveys were actively begun in October, 1905, by the construction company, and prosecuted to completion in November, and the line staked out over the disputed strip. At the same time option contracts were rapidly obtained running to one of the promoters of the new company. The company itself became fully organized and incorporated October 25, 1905, with practically the same executive officers as the construction company, and the work already begun proceeded without interruption. Twenty thousand dollars was paid in by stockholders, and resolutions were adopted by the board of directors which are set forth in full in the statement, and upon the proper construction of these resolutions depends the

question whether the respondent by decisive corporate act completed the location of its proposed railroad over the strip in question prior to January 16, 1906.

A railroad corporation may acquire its necessary real estate or right of way by purchase as well as by condemnation. Few would doubt that if the board of directors of such a corporation by resolution authorized its executive officers to survey and locate a right of way between given points and purchase the same, and appropriated corporate money to be used for such purpose, and the officers under this authority in good faith selected a route, caused it to be surveyed and staked out, determined that the road should be built upon it, and purchased, or contracted to purchase, the necessary land, this would constitute a completed location of the right of way, conferring priority of right. The statute requires location of the route by the board of directors as a preliminary to condemnation proceedings, but we find no such requirement as a preliminary to purchase. The idea that a rival company could step in and make a survey and condemn the land so purchased, simply because its directors had afterwards adopted a formal resolution locating its route over them, would be at once rejected. The appropriation for railroad purposes was already complete. *Atlanta, K. & N. R. Co. v. Southern R. Co.* 131 Fed. 657, 66 C. C. A. 601.

The fact that a railway company, proceeding to acquire a right of way by purchase, adopts a survey already made or partially made by another company or by promoters, cannot in reason be held to affect its rights. The essential thing is that an accurate survey and location upon the ground has been made, whether made by the company itself, or by another and then adopted by the company. *Lower v. C., B. & Q. R. Co.* 59 Iowa, 563, 13 N. W. 718; *Morris & E. R. Co. v. Blair,* 9 N. J. Eq. 635.

In the present case the route was partially surveyed and some options obtained from property holders before the for-

mation of the respondent corporation and in contemplation that such corporation would be formed and carry on the work. Did the resolutions adopted by the directors of the new corporation in effect adopt these acts and locate the route and authorize the executive officers of the company to proceed and carry out the plans already under way and purchase the route on behalf of the corporation? Fairly construed in the light of the situation, we think they did. In substance these resolutions conferred power on the president, secretary, and treasurer: (1) To make a contract with the construction company, subject to the approval of the board, for the acquirement of all necessary additional rights of way, privileges, franchises, and other rights for the proposed line; (2) in the meantime to arrange with the construction company to continue securing necessary franchises and rights of way for the line; and (3) to pay to the construction company out of the corporate funds not exceeding $20,000 for rights of way already secured and on account of disbursements and services in procuring additional rights of way and franchises, etc.

The wording is not as clear as could be wished, but it seems to us unmistakable that these resolutions in effect locate the proposed line on the route tentatively adopted by the construction company, and ratify the previous acts of the construction company in securing franchises and rights of way, and authorize the officers to arrange for the continuance and completion of the work so begun and to purchase the rights of way and franchises already secured by the construction company. Certainly this was the understanding of every person concerned. The officers proceeded on this basis. The survey was pushed to completion in November. The option contracts already secured were assigned to the new company early in November. Further option contracts were obtained, and before January 16, 1906, the respondent company owned option contracts covering nearly eight out of the nine miles of disputed right of way in the two counties of Milwaukee and

Ozaukee. Franchises and highway-crossing permits were obtained from the various town and village authorities on the line. The $20,000 appropriated for the purpose was used as required. Early in February deeds were obtained from practically all who had given options. All this was done with the knowledge and approval of the directors of the respondent company, although without further corporate action. The industry and activity with which the enterprise was pushed was in marked contrast with the leisurely procedure of the petitioner, which had spent more than two years in making its tentative survey and maps. It seems probable that a race of diligence had begun. Mr. Walker had in fact seen some of the petitioner's stakes near Cedarburg on his preliminary trip over the route; but if, as the court found, these were mere experimental stakes, set without intention to build, their presence could not prevent another company from taking the necessary steps to acquire the land, provided it intended in good faith to build a railroad thereon. In such case the prize would go to the company which first secured a completed location. So it appears that prior to January 16, 1906, the respondent company had made or adopted a fully completed survey over the disputed lands, and determined in good faith to build its railroad thereon, had secured all the necessary franchises and crossing privileges from towns and villages, and had obtained option contracts on all but a very small fraction of said lands, and intended in good faith to utilize such options and take deeds of the lands at an early date. These are very decisive acts, and, unless it be necessary that it should have actually secured deeds or binding contracts to purchase the lands, these acts must be held to constitute a completed location, so far at least as to give precedence in a contest with a rival company seeking to obtain the same lands. Certainly it was not necessary that it should have paid for the lands or secured deeds. As to all the world except the owner, the appropriation of land for railroad pur-

poses may be complete without either of these steps, and the only question, then, is whether it was necessary that it should have bound itself by contract to purchase the lands. We think not. The essential requirement is, not that there should be a completed purchase, but that there should be decisive corporate action taken in good faith locating the route and committing the corporation to that route, though not necessarily irrevocably. The securing of option contracts over practically the whole line surveyed, with the *bona fide* intention of utilizing them and completing the purchases and building the line, must be held to be such a decisive act, and we therefore hold that the petition for condemnation was properly denied.

Numerous authorities were cited to our attention, most of which, however, throw little light on the determination of the question here presented on account of differences in the statutory provisions of the different states. In those states which require recording or filing of the survey in some public office preliminary to an application to have damages assessed, such recording is held to give a prior right, or impress a lien on the lands for a reasonable time superior to any right thereafter obtained by purchase by others, even though such purchase be made before the proceedings for assessment of damages are commenced. *Barre R. Co. v. M. & W. R. R. Co.* 61 Vt. 1, 17 Atl. 923; *Morris & E. R. Co. v. Blair,* 9 N. J. Eq. 635; *Rochester, H. & L. R. Co. v. N. Y., L. E. & W. R. Co.* 110 N. Y. 128, 17 N. E. 680. We have no such provision in our statutes. The only provision resembling it in our statutes is that clause of sec. 1846, *supra,* which requires that a map of the proposed route and the land sought to be taken be attached to the petition for condemnation. If it were to be held that the filing of this map is the pivotal act on which the petitioner must depend for priority of right, then the logic of the decisions named would defeat the petitioner, because prior to that time the respondent had in good faith

secured deeds to all but a small fraction of the lands in dispute, and thus, beyond all controversy, had performed every act necessary to constitute a completed location by purchase.

Again, decisions are cited to the effect that a railroad company cannot adopt an unauthorized survey made by promoters or by another company, and thus obtain a location as against another company seeking to condemn. *New Brighton & N. C. R. Co. v. P., Y. & C. R. Co.* 105 Pa. St. 13; *Washington & I. R. Co. v. C. D. R. Co.* 160 U. S. 77, 16 Sup. Ct. 231. This is not universally held, as we have previously seen in this opinion; but, conceding it to be correct in cases where the rival companies are both seeking to acquire title by condemnation or legislative grant, as in the cases cited, still it would not necessarily control in the present case. Here the respondent was not seeking to condemn, but was proceeding to acquire title by purchase. There is no statutory provision which expressly or by implication requires the survey and staking to be done by the company itself when it is seeking to purchase, as sec. 1846, *supra,* seems to require in case of condemnation. Furthermore, in the present case the survey was only partially made by the promoters; the greater part was made by authority of the respondent itself after its organization. Authorities holding that the location of the route cannot be delegated to a committee (*Weidenfeld v. S. R. R. Co.* 48 Fed. 615), or that location of the route cannot be made by the act of the surveyor in surveying and marking a line without action by the directors (*Williamsport & N. B. R. Co. v. P. R. Co.* 141 Pa. St. 407, 21 Atl. 645), plainly can have no bearing, for the reason that in the present case, as we construe the resolutions of the directors, they themselves fixed the route and located the line.

Our attention is called to sec. 1854, Stats. (1898), which provides that, when one railroad company shall require any lands "previously acquired" by another railroad company, the same may be condemned, providing that no land shall be

taken in such manner as to interfere with the main track of the first established railroad, except for crossings. As this statute refers to land "previously acquired," and as in the present case the respondent had not in fact acquired the land in dispute when the petitioner's resolution locating its route was adopted, there seems to be much doubt whether the section can be held to apply to the present case, and hence we have preferred to rest our decision on general principles of law.

*By the Court.*—Order affirmed.

TIMLIN, J., took no part.