## GALVESTON, H. & S. A. RY. CO. v. CITY OF EAGLE PASS.  (No. 524–3988.)*

(Commission of Appeals of Texas, Section "A." April 16, 1924.)

**1. Dedication ⊝⟋44—Burden of proof held on city to show dedication as against railroad asserting right to locus in quo.**

In a suit by a city to compel a railway company to remove its depot from land alleged to have been dedicated for a public street, *held*, that the burden of proof was upon the city to establish dedication by clear and unequivocal proof prior to the time a superior right to the land attached in favor of the railway company; and no presumption could be indulged.

**2. Railroads ⊝⟋66—Railroad's entry with consent of owner for compensation presumed.**

In a suit by a city to compel a railway company to remove its depot from land alleged to have been dedicated by the owner in 1884 for street purposes, *held*, in the absence of proof to the contrary, it would be presumed that, when the railway company entered upon the land in 1882 and constructed its buildings thereon, it did so with the consent and agreement of the owner, and that it had paid or agreed to pay him everything necessary for the acquisition of the property.

**3. Railroads ⊝⟋69—Expression in conveyance to railway company "exclusive of streets" held mere description not limiting estate granted.**

A conveyance to a railway company providing that a warehouse, if erected, shall be erected near the passenger depot or freight warehouse, or within the boundaries designated as depot grounds or railroad reservation, describing the latter by number of feet, "exclusive of streets," *held* not to show that, as to a brick depot already on the land, the com-

---

pany, when it erected it, recognized or acquiesced in any agreement or understanding that the land was then subject to an easement for streets; the expression "exclusive of streets," being a matter of description not limiting estate granted.

**4. Dedication ⊚⟲41—Conduct of owner held to raise presumption against intent to dedicate.**

In a suit by a city to compel railway company to remove its depot from land alleged to have been dedicated for street purposes, *held*, that as against the city it is to be presumed that the owner, who lived nine years after the erection of the depot, knew that it was situated on the land, and that the entrance upon the land and construction thereon of the depot was with his consent.

**5. Eminent domain ⊚⟲320—Owner's conveyance or judicial decree not necessary to assert right to property taken under power of.**

When property has been taken under right of eminent domain, whether with or without the consent of the owner, who has accepted compensation, the property becomes expropriated and appropriated to the public use, without the necessity of a conveyance from the owner or a judicial decree.

**6. Eminent domain ⊚⟲166, 317(1), 319—Taking without formal condemnation proceedings held to vest rights superior to subsequent attempted dedication by owner; "taking."**

A railway company's entrance upon land (in 1882), and construction of a track and buildings thereon, the owner being fully compensated therefor in a manner satisfactory to him, *held* a "taking" as authorized by eminent domain statute, just as effectively as if done by the formal method prescribed by law, and the land from that date became stamped with a public character, and the railway company had a vested right in it to the use of the same for its purposes, which right could not be defeated by an attempted dedication thereafter on the part of the owner to another public use inconsistent with the use to which it was already dedicated.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Taking (In Eminent Domain).]

**7. Dedication ⊚⟲44—Clear and convincing proof required to show railway's intention to dedicate land, occupied by depot, to street purposes.**

Where at the time an owner of land attempted to dedicate it to a city for street purposes, a railway company had constructed a brick depot on the land with the owner's consent, its intention to appropriate such land to such purposes which would necessarily require the destruction or removal of the building is not to be attributed to the company except upon clear and convincing proof.

**8. Dedication ⊚⟲44—Evidence held not to show dedication conferring rights prior to those of railroad.**

In a suit by a city to compel a railway company to remove its depot on land alleged to have been dedicated to the public as a street, evidence *held* not to show such alleged

dedication prior to the acquisition by the railway company of a vested right therein to use the same for its purposes which was a public use, so that the judgment of the trial court ordering the company to open the land and remove the obstructions therefrom was without evidence to support it.

Appeal from Court of Civil Appeals of Fourth Supreme Judicial District.

Suit by the City of Eagle Pass against the Galveston, Harrisburg & San Antonio Railway Company. From an adverse judgment, defendant appealed to the Court of Civil Appeals, which affirmed (249 S. W. 268), and defendant appeals. Reversed and remanded.

W. B. Teagarden, of San Antonio, and Baker, Botts, Parker & Garwood, of Houston, for appellant.

Wray Zuehl and Ben V. King, both of Eagle Pass, for appellee.

GERMAN, P. J. The City of Eagle Pass brought this suit in the district court of Maverick county, Tex., against the Galveston, Harrisburg & San Antonio Railway Company; the purpose being to require the railway company to open a part of what is alleged to be Main street of the city of Eagle Pass, and to remove therefrom a portion of a freight depot, said depot being located partly in what is claimed to be a projection of Main street across the railway company's property. The city claims that this property was dedicated to public use as a street by one John Twohig, as evidenced by instrument in writing dated January 21, 1884, and by a map or plat of the town of Eagle Pass executed about that date. The contents of these instruments will be referred to later. The railway company pleaded several defenses, but under the view we have taken of the case it is not necessary to consider but one of its contentions. This contention is: That it is shown as a matter of law that prior to the time John Twohig undertook to make a dedication of the land in question as a street the railway company had, with the knowledge, consent, and agreement of the said Twohig, entered upon the land and erected valuable buildings and improvements thereon, appropriating and dedicating it to its use for railway purposes, which was a public use, inconsistent with the use of same for street purposes, and the company's rights thereto and to the use of same became vested as against John Twohig and the public, and the same have never been lost or abandoned but have been continually asserted for more than 38 years. The trial court, without a jury, rendered judgment in favor of the city, declaring the land in question to be a part of Main street, and ordering the railway company to open the same and remove all obstructions therefrom. This judgment was affirmed by the Court of Civil Appeals. 249 S. W. 268.

⊚⟲For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

The city of Eagle Pass claims that a dedication of this property by John Twohig as a street is conclusively shown by the following:

On January 21, 1884, Twohig, executed to the railway company his warranty deed, conveying with other lands the following:

"The following described lots, blocks and tracts of land lying and being situated east and near the town of Eagle Pass, in Maverick county and state of Texas: All that tract of land known as the 'Railroad Reservation' and right of way for said Galveston, Harrisburg & San Antonio Railroad Company; said railroad reservation having a width of three hundred feet and a length exclusive of streets of twenty-nine hundred and sixty feet (2,960) more or less, extending from Garrison street to north line of survey No. 35, and bounded on the east by Pierce street, and on the west by Converse street. Likewise the right of way to said railroad company across my land in Maverick county not exceeding one hundred and fifty feet in width. Likewise the equal and undivided half or one-half interest in the land owned by me east of Pierce street and railroad reservation and embraced between the line of Garrison street and north line of surveys No. 34 and 35 east of Pierce street and railroad reservation, and containing three hundred and fifty-two and six-tenths acres of land more or less; the property herein referred to being shown on the map executed by E. A. Giraud and signed by me, and this day delivered to James Converse, chief engineer of said company, and attorney in fact of Thomas W. Pierce, president of said company."

One of the conditions of said conveyance was as follows:

"Should a bonded warehouse be erected it shall be placed and maintained on the lots or blocks in the immediate neighborhood of the passenger depot or freight warehouse, or within the boundaries designated as the depot grounds or railroad reservation, which are three hundred feet in width and twenty-nine hundred and sixty feet (2,960) more or less in length, exclusive of streets."

On the same day the railway company and Twohig entered into a written agreement with reference to the 352.6-acre tract of land which contained, among other things, the following:

"That the undivided half of said land referred to in said conveyance and traced on the map executed by E. A. Giraud, referred to in said deed of conveyance, shall be ascertained and divided as follows by E. A. Giraud or some other competent surveyor to be selected by the parties to this instrument in blocks and to correspond as nearly as possible with the streets running from Commercial street crossing the railroad reserve."

It is shown that this land was subdivided as contemplated by the parties, and that Giraud made a map or plat showing the subdivision, and the parties ratified this division by instruments dated May 22 and 23, 1889; but this map by Giraud was not produced, and there was no evidence showing the location of streets or how they corresponded with the streets that had theretofore been laid out in the town of Eagle Pass.

There was introduced in evidence what purports to be a map of Eagle Pass, which had been in the county clerk's office and used by the public as the official map of Eagle Pass as far back as the year 1894, and possibly longer. This map does not show to have ever been filed in the county clerk's office, and no one knows who left it there. It bears the following indorsement: "A copy from E. A. Giraud's map. Made May 14, 1884. Nicholas Luginsky." This map shows the railroad running through a long strip of land lying on the eastern edge of the town, containing six blocks, bounded on the west by Converse street and on the east by Pierce street, and extending almost the full length of this strip are the words: "Galveston, Harrisburg, and San Antonio Railroad Company." This map shows several streets, including Main street, extending from Commercial street, running east to the railroad property. The street lines are indicated by solid lines in black ink from Commercial street to Converse street, which bounds the railroad property on the west. They are then continued across the railroad property by dotted lines. There is nothing to show when Giraud made the original map of which this is a copy, and nothing to show that this is a true and correct copy of the Giraud map. However, in view of the disposition we are making of the case, it may be assumed that this copy is the same as the copy of the Giraud map which was delivered by Twohig to the railway company January 21, 1884.

[1] The Court of Civil Appeals reached the conclusion that this evidence was sufficient to show that Main street was laid out across the railroad property and dedicated to public use prior to January 21, 1884, and the matters referred to above indicate a recognition of such dedication on the part of Twohig and the railway company. However, that court declined to indulge any presumption as to when such dedication actually took place, or upon whose authority the town was laid out and the street designated across this land. The burden of proof being upon the city to establish the fact of dedication by clear and unequivocal proof prior to the time a superior right to the land attached in favor of the railway company, no presumption could be indulged; and here we find the fatal weakness in the claim urged by the city. It may be admitted that the recitations in the instruments, taken in connection with the facts disclosed by the map, indicate an intention on the part of Twohig to dedicate streets across the property conveyed to the railway company, or really show that at that time he had already undertaken to dedicate such streets. However, if effect be given to the plat as the act of Twohig, the fact that

the streets across the railroad property are shown only by dotted lines would, we think, indicate that the streets had not actually been laid out; but the intention to dedicate them was prospective. However, in any event we think the undisputed proof shows that nearly two years prior to the date of the formal conveyance the railway company had acquired such rights and title to the property, for its own purposes, which were of a public nature, as to prevent any one claiming under Twohig acquiring the right to use such property for street purposes, except in the manner provided by law for the exercise of the power of eminent domain; and as to whether this property would be subject to the exercise of such right by the city of Eagle Pass, under all the circumstances, it is wholly unnecessary for us to decide.

[2-5] It is undisputed that the railway company entered upon the land in question as early as the year 1882 and built thereon its freight depot, which was then only a frame building. Some time in the year 1883 the frame building was taken away and a brick building erected in its place, and it has continued to occupy this land and to be used by the railway company for depot purposes until the present day. The statute at that time provided that no railroad company should enter upon any real estate, except for a lineal survey, for the purpose of taking and condemning the same, until the company had agreed with and paid the owner all damages that might be caused to the land by the condemnation of the land and the construction of the road. This is not a contest between the railway company and the landowner. In the absence of proof to the contrary, it will be presumed that when the railway company entered upon this land in 1882 and constructed its buildings thereon it was with the consent and agreement of Twohig, and that it had paid or agreed to pay him everything necessary for the acquisition of the property. Wilson v. Southern Ry. (S. C.) 115 S. E. 768. The instruments of 1884 clearly indicate that a donation of these lands was made by Twohig to the company. At the time of the formal conveyance January 21, 1884, the brick depot was then on this land, and there is absolutely nothing in the conveyance to show that when it was put there the company recognized or acquiesced in any agreement or understanding that the land was then subject to an easement for streets. The expression "exclusive of streets" contained in the deed is purely a matter of description, and is in no sense a limitation on the estate granted. Twohig lived until 1891, and is presumed to have known that the depot was situated upon the land in question. There is no proof to show that he was not fully satisfied, and the necessary conclusion is that the entry by the railway company on the land in 1882 and the construction of its depot was with his consent. The statute

then gave the railway company the right to take such lands as were necessary for right of way and for the proper construction of its road and depot facilities. It has been held that this power of eminent domain in effect constitutes a grant from the state to the property reasonably necessary for the particular purpose, subject to the condition that compensation is to be made for it; and, when the property has been taken, whether with or without the consent of the owner, and compensation has been accepted, in whatever manner it may be made, the property becomes expropriated and appropriated to the public use, without the necessity of a conveyance from the owner or a judicial decree. City of San Antonio v. Grandjean, 91 Tex. 430, 44 S. W. 476; Getzendaner v. T. & B. V. Ry. Co., 43 Tex. Civ. App. 66, 102 S. W. 161, and cases cited.

[6] When the railway company entered upon the land in question in 1882 and constructed its track and buildings thereon, the owner being fully compensated therefor in a manner satisfactory to him, this constituted a "taking" as authorized by the statute just as effectively as if done by the formal method prescribed by law, and the land from that date became stamped with a public character, the railway company having therein a vested right to the use of the same for its purposes; and it could not thereafter by an attempted dedication on the part of Twohig be made subject to another public use, inconsistent or incompatible with the use to which it was already dedicated. T. & N. O. Ry. Co. v. Sutor, 56 Tex. 496; Reitzer v. Medina Valley Irrigation Co. (Tex. Civ. App.) 153 S. W. 380; In re Newport Ave. in City of New York, 218 N. Y. 274, 112 N. E. 911; Sioux City & D. M. Ry. Co. v. C. M. & St. P. Ry. Co. (C. C.) 27 Fed. 770; Kanawha, G. J. & E. R. Co. v. Glen Jean L. L. & D. W. R. Co., 45 W. Va. 119, 30 S. E. 86; In re Milwaukee L. H. & T. Co. v. Ry. Co., 132 Wis. 313, 112 N. W. 663; Fayetteville St. Ry. v. R. R. Co., 142 N. C. 423, 55 S. E. 345; R. H. & L. R. R. Co. v. N. Y. R. R. Co., 110 N. Y. 128, 17 N. E. 680; Ft. Wayne & S. W. Traction Co. v. Ry. Co., 170 Ind. 49, 83 N. E. 665; W. & N. B. Ry. Co. v. P. & E. R. Co., 141 Pa. 407, 21 Atl. 645, 12 L. R. A. 220; C. & O. Ry. Co. v. Deepwater Ry. Co., 57 W. Va. 641, 50 S. E. 890; Nicomen Boom Co. v. North Shore B. & D. Co., 40 Wash. 315, 82 Pac. 412; Barre R. Co. v. M. & W. R. R. Co., 61 Vt. 1, 17 Atl. 923, 4 L. R. A. 785, 15 Am. St. Rep. 877.

The question of the rights of a corporation in connection with the property which it has acquired, or sought to condemn, has usually arisen in contests between different railroad companies seeking to appropriate the same land for their purposes, but has frequently arisen in contests between municipal corporations and railroad companies, or between corporations performing other kinds of public service; but in all cases the principle

is the same. In many cases will be found a discussion as to what point in the acquisition of the land for public purposes it becomes stamped with a public character so as to ·be governed by the rules applicable to the condemnation of land devoted to public use. But here no such question can arise, as it is evident that the land in question here became so impressed as early as 1882 or 1883. The principle applicable in all cases, but which has been deduced mostly from cases dealing with the rights of railroad companies with reference to the filing of their location maps or plats, has been concisely stated by the Supreme Court of Washington in the case of Nicomen Boom Co. v. North Shore Boom & Driving Co., supra:

"Under legislative schemes for the location of railroad lines which are initiated by the filing of plats of location, it is held that compliance with the law in that particular secures to the locating company the right to construct and operate a railroad upon such line, exclusive in that respect as to all other railroad corporations and free from the interference of any party. The right to locate its line of road in the place of its selection is delegated to the corporation by the sovereign power. ·The further right to subsequently acquire in invitum the right of way and necessary lands for operation of the road from the landowners is likewise delegated. The source of the franchise is in the sovereign power, which power confers the franchise upon the corporation as its delegated representative, and the grant is for public, and not for private, purposes. It is held that, inasmuch as public considerations enter into the grant of the franchise, public policy therefore favors it for the public convenience and use, and that a railroad company, by the filing of its plat of location and by reason of the notice thereof, impresses upon the lands a right in the nature of a lien in favor of its right to construct, which ripens into title through purchase or condemnation proceedings. It is further held that, when a franchise has been thus conferred, no other railroad company may acquire title to the lands within such a location, or construct a road thereon to the exclusion of the right of the first locating company to acquire such title in invitum and to construct its road upon the lands."

The case of Sioux City & D. M. Ry. Co. v. Chicago, M. & St. P. Ry. Co., supra, arose in the state of Iowa, and the statutes of that state at that time were practically the same as the statute of our state at the time of this transaction with reference to the power of a railroad company to take lands for its purposes. There it was held that when a railroad company had fixed its rights by the location of its road, before condemnation, such rights could not be defeated by another company procuring the right of way by purchase from the owner. In the opinion Judge Shiras used this language:

"It is certainly equitable that a company, which in good faith surveys and locates a line of railway, and pays the expense thereof, should have a prior claim for the right of way for at least a reasonable length of time. The company does not perfect its right to the use of the land, as against the owner thereof, until it has paid the damages, but, as against a railroad company, [and we might add a municipal or other corporation] it may have a prior right, and better equity. The right to the use of the right of way is a public, not a private, right. It is, in fact, a grant from the state, and although the payment of the damages to the owner is a necessary prerequisite, the state may define who shall have the prior right to pay the damages to the owner, and thereby acquire a perfected right to the easement. · The owner cannot, by conveying the right of way to A., thereby prevent the state from granting the right to B. All that the owner can demand is that his damages shall be paid, and, and, subject. to the right of compensation to the owner, the state has the control over the right of way, and can, by statute, prescribe when, and by what acts, the right thereto shall vest, and also what shall constitute an abandonment of such right."

[7] The cases of Barre R. Co. v. M. & W. R. R. Co., supra, and Union Terminal R. Co. v. K. C. Belt R. Co., 9 Kan. App. 281, 60 Pac. 543, are also cases where it was held that the rights of the first locating company could not be defeated by sale of the lands by the owner to other companies. It follows in this case that if Twohig could not defeat the rights of the railway company by a subsequent conveyance of the land to another party, he could not do so by a dedication of a street after the rights of the company had become vested.

There is no proof whatever that the dedication of the street occurred prior to the entry of the railway company on the land in 1882, or that the company took the land subject to such dedication. It is not claimed that the transactions were sufficient to create an estoppel against the company. The recitations in the instruments, and the conduct of the railway company cannot be construed as constituting a dedication of the street on its part, after the acquisition of the fee to the land in 1884. At that time it had already constructed its brick depot on this particular portion of the land, and it would be unreasonable to conclude that it intended to appropriate land which was occupied by a valuable building to a use which would necessarily, at some time, require the destruction or removal of the building. Such intention should not be attributed to the company except upon clear and convincing proof.·

[8] The proof wholly· failing to show a dedication of this land· to the public as 'a street before the date the railway company acquired a vested right therein to use the same for its purposes, which was a public use, the judgment of the trial court was without evidence to support it. We therefore recommend that the judgment of the Court of Civil Appeals and of the district court be reversed, and the cause be remanded.

CURETON, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.

We approve the holding of the Commission of Appeals on the question discussed in its opinion.