GALVESTON, H. & S. A. RY. CO. v. CITY OF EAGLE PASS. (No. 6880.)*

(Court of Civil Appeals of Texas. San Antonio. Feb. 14, 1923. Rehearing Denied March 14, 1923.)

1. **Evidence ☞441(7)—Written contract held controlling as to rights of public rather than previous oral and implied agreements.**

In a suit by a city to compel a railroad company to move its freight depot, which had been built across a strip of land on which a street was later laid out, the rights of the public and of the parties to a contract under which the depot was erected must be measured by the writings of the parties, rather than by oral and implied agreements theretofore made between them.

2. **Dedication ☞44 — Finding that street had been dedicated to public use sustained.**

In an action by a city to compel a railroad company to move its freight depot, which had been built across the land of a street as extended, evidence *held* to warrant a finding that the street had been dedicated to public use, and that the city was warranted in ordering it opened for that purpose.

3. **Dedication ☞16(1) — How lands may be dedicated to public use stated.**

No particular words or ceremonies or form of conveyance is necessary to effectuate a dedication of lands to the public use; anything which clearly evidences the intention of the donor works that effect, and it may be accomplished by express words or by implication or may be inferred from conduct or any circumstance which discloses the intention.

4. **Dedication ☞31—Acceptance essential.**

An acceptance is essential to effectuate a dedication of lands to public use.

5. **Dedication ☞35(1), 39—How "acceptance" of lands dedicated to public use may be effected stated.**

An acceptance of lands dedicated to public use may be effected either by the acts of the donor by which he is estopped to deny the dedication, or by the public through formal acceptance by its representatives, or by the assumption by public authorities of dominion over the premises which have been dedicated.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Acceptance.]

6. **Dedication ☞34 — Municipality need not accept dedicated lands immediately, but must do so within a reasonable time.**

A municipality is not required to evidence acceptance of lands dedicated to public use immediately following the dedication, but is only required to do so within a reasonable time, which is determined by the circumstances in each particular case.

7. **Dedication ☞34—Acceptance of land dedicated for streets by city held within reasonable time.**

Where land had been dedicated by the owner to public use as streets, but the city did not evidence its acceptance thereof until a new addition was opened and settlement thereof begun, such acceptance was within a reasonable time.

8. **Dedication ☞19(5) — Owner selling lots with reference to plat held estopped to deny dedication of streets.**

Where a landowner dedicated land for public use as streets and sold lots with reference to a map showing such streets, the owner was estopped to deny a dedication.

9. **Dedication ☞17—Grant does not fail because of absence of grantee.**

Dedication of land to the public will not fail because of the absence of a grantee.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error granted May 2, 1923.

**10. Adverse possession ⊜⧳8(2) — Limitations do not run against lands dedicated for streets under control of county.**

Where lands dedicated for streets in an unincorporated town were under control of the county, limitations did not run in favor of persons in possession of such lands.

**11. Dedication ⊜⧳39—Railroad company having knowledge of dedication for street purposes held not entitled to invoke doctrine of equitable estoppel to defeat rights of public.**

Where a railroad company purchased a tract of land, and the plat showed dedication of a street thereon, which neither the county nor the city afterwards incorporated had formally abandoned, and the existence of which was known to the railroad company, the company could not interpose the doctrine of equitable estoppel to defeat the right of the public in the street.

**12. Evidence ⊜⧳177—Copy of plat held admissible, where defendant alone could explain absence of original.**

In a suit by a city to compel a railroad company to move a freight depot, which had been built across land dedicated for street purposes, a map which was a copy of the original plat was properly admitted in evidence, in view of the absence of the original, which the railroad company alone could explain.

**13. Appeal and error ⊜⧳1050(1)—Admission of copy of map, if error, held harmless.**

Where, in a suit by a city to compel a railroad company to move its freight depot, built across land dedicated for a street, the copy of a plat was admitted, such admission, if error, was not prejudicial to defendant, it being merely cumulative of plaintiff's evidence and of the evidence of a map with reference to which sales of lots had been made.

**14. Railroads ⊜⧳60—Railroad company erecting building on dedicated street held not entitled to value thereof.**

In a suit by a city to compel a railroad company to move its freight depot from land which had been dedicated for a public street, defendant could not recover for improvements erected upon such premises, it being charged with knowledge that, when need arose, the municipality would take possession of such premises.

Appeal from District Court, Maverick County; Joseph Jones, Judge.

Suit by the City of Eagle Pass against the Galveston, Harrisburg & San Antonio Railway Company. From an adverse judgment, defendant appeals. Affirmed.

Baker, Botts, Parker & Garwood, of Houston, W. B. Teagarden, of San Antonio, and Boggess, Smith & LaCrosse, of Del Rio, for appellant.

Ben V. King and Wray Zuehl, both of Eagle Pass, for appellee.

SMITH, J. Late in the year 1882 appellant constructed its railway to the then un-incorporated town of Eagle Pass, locating its main line, switchyards, depots, and warehouses upon property owned by John Twohig, along the east edge of the town, between Converse street on the west and Pierce street on the east. The latter street marked the eastern boundary of the town as then laid out. The record does not disclose what authority, if any, the railway company at the time had from Twohig to occupy these premises, but on January 21, 1884, the latter by deed conveyed this property, together with an undivided one-half interest in a 350-acre tract of land adjacent thereto on the east, to the company. About this time—just when is not definitely disclosed—the railway company constructed a freight depot on this strip at the point where Main street, as then laid out, crossed that strip. This depot, as substituted or altered, still stands approximately on this location, and Main street is now, as it was then, the principal business street of the town.

The town of Eagle Pass was incorporated in 1909, and the railway yards were embraced within the corporate limits, which extended no further east than Pierce street, adjacent to the railway property. In 1920 these limits were extended east, embracing the 350-acre tract to which we have referred. This tract had in the meantime been platted as an addition to the town and subdivided into lots, blocks, etc., to correspond with the streets in the original town. By reason of its location, which it has now occupied for approximately 40 years, the railway company's freight depot is directly across the projection of Main street, which is thus blocked to traffic from either direction. In the fall of 1921 the city called upon the railway company to remove its building, but not its tracks, of which there are 11, and open up this street across its right of way, and, upon the company's refusal, the city brought this suit to enforce its demand. The cause was tried before the court without a jury, and from an adverse judgment the railway company has appealed.

The city's claim is based upon the contention that the use of the premises in controversy for street purposes was irrevocably dedicated to the public by John Twohig, and accepted by the public. It is contended that the act of dedication is evidenced by the following facts, which we may say are either undisputed or are supported by sufficient evidence to warrant the implied findings of the trial court affirming them:

First. In the deed of January 21, 1884, Twohig conveyed to the railway company, several tracts, including the one in controversy, "situated east and near" the town. The tract embracing the premises in controversy was described as "all that tract of land known as the 'railroad reservation' and right of way * * *; said railroad reservation

having a width of 300 feet and a length, *exclusive of streets*" of 2,960 feet, more or less, "extending from Garrison street to north line of survey 35, and bounded on the east by Pierce street, and on the west by Converse street." The property was further described as "the property herein referred to being shown in the map executed by E. A. Giraud and signed by me, and this day delivered to James Converse, chief engineer of said company." The deed contained the further recital:

"* * * The express conditions and principal considerations received by me for granting the privileges and conveying the land herein described is that said railroad corporation by its agent agrees to the following conditions and stipulations, to wit: First. To erect and maintain all buildings belonging to said railroad company upon the lots or blocks of land donated to said company west of Pierce street and the line of railway, which lots or blocks and railroad reservation, west of said Pierce street and said line or railway, are to be used for railroad purposes only, and are not to be alienated or conveyed by said railroad company; should a bonded warehouse be erected, it shall be placed and maintained on the lots or blocks in the immediate neighborhood of the passenger or freight warehouses, or within the boundaries designated as the depot grounds or railroad reservation, which are three hundred feet in width and twenty-nine hundred and sixty (2,-960) feet more or less in length, *exclusive of streets. * * *"

The significant fact should be added here, in connection with the recital that the reservation was 2,960 feet in length, "exclusive of streets," that the copy of Giraud's map in evidence discloses that, by excluding from the computation the space occupied by Main and parallel streets, delineated on that map as crossing the reservation, the latter measures almost precisely 2,960 feet long, as recited; whereas, by including those streets, the distance in length extends to approximately 3,300 feet.

Second. On the same day the deed was executed, January 21, 1884, Twohig and the railway company entered into a contract, with express reference to the deed, fixing a method of dividing the 350-acre tract conveyed in that deed. This contract embraced a provision that the tract should be "divided * * * into blocks, and to correspond as nearly as possible with the streets running from Commercial street (on the western edge of town) crossing the railroad reserve." The land was subdivided as provided for, the division was confirmed by the parties in subsequent agreements executed on May 22 and 23, 1889, and the parties each conveyed to the other his respective parts of the property. In 1910 the railway company conveyed the property thus acquired to the Texas Townsite Company, and in 1916 the latter conveyed it to Van E. McFarland, who platted it into an addition, which in 1920 was annexed to the city of Eagle Pass. In all these conveyances the property was in part described as being "represented in the donation map" to the railway company by Twohig, "dated January 21, 1884."

Third. A map was placed in evidence purporting to be a copy of the map of the old town, as well as the 350-acre tract, adopted by Twohig and the railway company at the time the property was conveyed by the former to the latter in January 21, 1884. Upon this map is delineated the railroad reservation and the town in detail as then laid out, and Main street is shown thereon to extend across the railroad reservation.

Fourth. The copy of the map referred to was the only map which has ever been available to the public for reference purposes in Eagle Pass, and it has been so used by the public since as far back as 1894, and, so far as the record shows to the contrary, its use may have begun when it was made in 1884. As the parties agreed that Twohig, who owned many lots in the old town, had conveyed those lots "with reference to the map of Eagle Pass," and as the map mentioned was the only map of Eagle Pass, it must be assumed that it was the one by which Twohig sold those lots. As has been stated, the scale employed on this map confirms the recital in Twohig's deed to the railway company that the reservation, when Main and other cross streets are excluded from the computation, measures 2,960 feet in length, as recited in the deed to the company.

[1] When the railroad reached Eagle Pass, the company took possession of the property, afterwards designated as the reservation, constructing its main line, switches, depots, and warehouses thereon. Not a word is shown of the arrangement, if any, with Twohig, the owner, by which the railway made this entry, and the first evidence of any agreement is found in the deed by which Twohig donated to the company this reservation, as well as an undivided one-half interest in the 350-acre tract lying adjacent thereto on the east. In the absence of a showing of any prior agreement, we must look alone to this conveyance in order to ascertain the purposes and intentions of the parties. Whether they had any prior oral agreement or not, and regardless of the terms of that agreement, if any, we must assume that it was merged into the first written expression thereof, disclosed in the deed, as modified and explained in the supplemental contract executed on the same day in connection therewith. Much less than two years had elapsed between the time the road reached Eagle Pass and the date of this deed and contract, and it is not perceived that so much time had elapsed, or that the rights of the parties had become so firmly established, that those rights, and any differences arising between the parties, could not be adjusted and composed, as seems to have been

done so satisfactorily and profitably to both parties in the deed and contract of January 21, 1884. This being true, we are not impressed with the earnest contention of appellant that because the railway company took possession and laid its plans and established its yards and essential structures on the reservation prior to entering into the writings with the owner of the fee, its easements in the land became vested for all the purposes it elected to adopt, and could not thereafter be divested out of it, even by solemn contracts in writing, based upon reciprocal considerations of unquestioned value. We think it quite clear that the rights of the parties to the contract, as well as the rights of the public, if any accrued to it thereby, must be measured by the writings rather than by unknown and purely speculative and conjectural oral or implied agreements theretofore made between the parties. These matters are raised in appellant's first assignment of error, which is overruled.

That the town had been laid out into lots, blocks, and streets prior to the coming of the railroad, and that Main and parallel streets as platted extended across what finally became the railroad reservation, seems conclusively established by the record. When, or by what process, or upon whose authority, the town had been so laid out, and the streets thereof located upon Twohig's land, is not shown, nor is there any occasion here to indulge any presumptions as to the effect of that historical fact with reference to a prior dedication of those streets to the public use. But the fact of their prior existence was expressly recognized by Twohig and the railway company when, in 1884, they finally fixed their respective rights in the premises; when, in the conveyance thereof, the reservation was described as being bounded by existing streets, and when Twohig conveyed the whole of the reservation, "exclusive of streets," to the railway company; when both parties by contract expressly recognized that the streets as then laid "cross the reservation," and when both parties confirmed the recitals that the streets crossed, and were excluded from the conveyance of the reservation by so delineating these facts upon the map, made for and adopted by them at the time.

[2, 3] We are of the opinion that the facts hereinbefore set out warranted the trial court in finding and concluding that the street in question had been dedicated to public use, and that the city was warranted in ordering it opened for that purpose. Of course, the intention to dedicate could have been better and more clearly expressed in the deed by affirmative provisions and restrictions, but no particular words or ceremonies, or form of conveyance, is necessary to effectuate a dedication of lands to the public use, nor is a written grant essential thereto. Anything which clearly evidences the intention of the donor works the effect. It may be accomplished by express words, or by implication, or it may be inferred from conduct, or any circumstance which discloses the intention. 8 R. C. L. pp. 889, 893; 23 L. R. A. (N. S.) 809, note; Oswald v. Grenet, 22 Tex. 94; Lamar County v. Clements, 49 Tex. 347. Here, Main street was laid across the reservation prior to the conveyance to the railway company, and the intention to include the street in the grant was clearly negatived in the conveyance, by expressly excluding it in computing the length of the reservation. The intention to leave the street undisturbed and uninterrupted was reaffirmed in the contract between the parties, in which it was recited that the east and west streets, which include Main, "crossing the reservation," should co-ordinate with the arrangement of the 350-acre tract thereafter to be platted, and this intention was expressly fixed by the map, made at the time, and by which Main street was projected across the reservation. These evidences, when considered together as they must be, are sufficient to establish the dedication of Main street to the use of the public, and the trial court was fully warranted in so finding.

[4-7] Appellant contends that, even though there was a dedication, it was not effectual because no acceptance thereof by the public was shown. It is true, of course, that acceptance is essential to effectuate a dedication, and it is universally so held. 8 R. C. L. p. 898. Acceptance may be effected either by the acts of the donor by which he is estopped to deny the dedication; or by the public through formal acceptance by its representatives, or by the assumption by public authorities of dominion over the premises which have been dedicated. In this case no formal acceptance was made by the city or any public authority, nor had any public authority ever undertaken to exercise any control or dominion over the premises in question until the year 1921, when the governing body of the city made demand upon the railway company to vacate the premises. A municipality, however, is not required to evidence acceptance immediately following the dedication, but is only required to do this within a reasonable time, which is determined by the circumstances in each particular case. In the case of a dedication of streets, as here, the public need not move towards accepting a dedication until the actual need arises for the use of the streets by the public. 8 R. C. L. p. 899; Dillon, Mun. Corp. § 1089; Elliott, Rds. & Sts. § 129; Corsicana v. Zorn, 97 Tex. 317, 78 S. W. 924; Krause v. El Paso (Tex. Civ. App.) 101 S. W. 828 (reversed by the Supreme Court, but upon other grounds).[1] It was shown that Main street was paved in 1919 as far east as the railroad reservation, where the paving terminated. From the reservation east no settlement had been undertaken until just prior to the extension of the city

---

[1] 101 Tex. 211, 106 S. W. 121, 14 L. R. A. (N. S.) 582, 130 Am. St. Rep. 831.

limits to include that territory in 1920. Until such settlement had begun, there was no occasion for extending Main street, of course, since its extension or opening would accommodate no one, and the improvement thereof would have been futile. As soon, however, as the addition east of the reservation was opened, and the settlement thereof begun, the city acted and undertook to exercise control over that portion of Main street covered by the reservation and connecting the town with the addition, for the purpose of opening and improving it for the use of the public in passing to and from the newly acquired and developed territory. The city thus met the requirement of accepting the dedication within a reasonable time, according to the rules laid down in the authorities cited.

[8] But, regardless of the long delay in acceptance by the city, we think Twohig, and the railroad company as well, are estopped by their own acts to deny the dedication, by reason of the agreement of the parties, and the evidence, that after the dedication, Twohig continued to sell off the lots in the old town owned by him, in the conveyance of which he expressly referred to the town map, on which Main street was shown to extend through and across the railroad reservation, thus in effect representing to the purchasers and to the world the continued existence of the dedication; and the railway company likewise committed itself in conveying its properties, lying east of the reservation, to the Townsite Company, to say nothing of its confirmation, in its final contracts with Twohig, in 1889, that Main and the streets paralleling it "crossed the railroad reserve." The promiscuous sale by Twohig of those lots with reference to that plat, which, although not recorded, was exhibited to the public in the county clerk's office, amounted to an immediate and irrevocable dedication of the streets, which he was thereafter estopped to deny. Dillon, § 1083; Oswald v. Grenet, 22 Tex. 194; Lamar County v. Clements, 49 Tex. 347.

[9, 10] Appellant contends that the city's cause of action was barred by the three, five and ten years' statutes of limitation, and by nonuser and laches on the part of the public and the municipality. As has been shown, the city was not incorporated until 1909. Dedication to the public will not fail because of the absence of a grantee, and will not fail in this case because there was no corporation to receive or accept it, since the city, upon coming into existence, was invested with control of the dedicated premises. Llano v. Llano County, 5 Tex. Civ. App. 132.[2] So, from the time of the dedication, in 1884, to the incorporation of the town in 1909, the public roads and streets in Eagle Pass and vicinity were under the control of the county, against which limitations do not run in favor of persons in possession of lands dedicated

[2] 23 S. W. 1008.

to the public. Elliott, Rds. & Sts. §§ 1187, 1188, 1189; Coleman v. Thurmond, 56 Tex. 514; Ry. v. Travis County, 62 Tex. 16; Marsalis v. Garrison (Tex. Civ. App.) 27 S. W. 932. And when the city of Eagle Pass came into existence, and assumed control of the streets in 1909, the act of 1887, exempting cities and towns from the statutes of limitation, was in effect. R. S. art. 5683.

[11] Nor can the doctrine of equitable estoppel be interposed by appellant to defeat the right of the public, at this late day, to begin the use of the easement acquired through the dedication. Neither the county nor the city had formally or by conduct disaffirmed or abandoned the right, the existence of which was necessarily known to the railway company, to whom the defense of estoppel is thereby rendered unavailable. Elliott, Rds. & Sts. § 1189; Krause v. El Paso (Tex. Civ. App.) 101 S. W. 828. As is aptly said by Elliott:

"It is difficult to conceive upon what principle an equitable estoppel can be securely placed in such cases, for the person who encroaches upon a public way must know, as a matter of law, that the way belongs to the public, and that the local authorities can neither directly nor indirectly alien the way, and that they cannot divert it to a private use. As the person who uses the highway must possess this knowledge, and in legal contemplation does possess it, one of the chief elements of an estoppel is absent. An estoppel cannot exist where the knowledge of both parties is equal and nothing is done by the one to mislead the other. In addition to this consideration may be noted another influential one already suggested in a different connection, and that is, the private use of the public way was wrong in the beginning and wrong each day of its continuance, and it is a strange perversion of principle to declare that one who bases his claim on an original and continued wrong may successfully appeal to equity to sanction and establish such a claim. It is, at all events, a great stretch of the doctrine of estoppel and a wide departure from the rule laid down by the earlier decisions and confirmed by many of the modern authorities."

It is urged very earnestly by appellant that the opening of Main street will force the company to remove its depot and warehouse facilities to another and distant location, at a cost of $200,000 or $250,000. If this result does ultimately follow the judgment in the cause, it is, of course, regrettable, and may seem entirely out of proportion to the benefits resulting to the public, but, if that judgment is correct, the hardship is one that should have been foreseen and forestalled by appellant, in the original location and arrangement of its facilities with reference to the paramount easement of the public. Elliott, § 1189; Krause v. El Paso, supra.

The conclusions we have stated, with reference to dedication, acceptance, estoppel, and limitation, are applicable to appellant's

1st, 2d, 3d, 4th, 5th, 6th, 7th, 11th, 12th, 13th, and 14th assignments of error, all of which, for the reasons given, are overruled.

. The original map or plat, made for and adopted by Twohig and the railway company at the time of the execution of the deed and contract in 1884, was not produced in evidence, nor were any of the maps made for or by Twohig and the company at any time. Under the provisions of the deed this original plat was at the time delivered to the representative of the railway company, and when this suit was filed the company was given notice to produce it upon the trial, or secondary evidence of its contents would be offered by the city. The company, however, did not produce the plat, and offered no explanation of its default; if the plat had been lost, or had passed out of the possession of the company or of its appropriate custodian, or had been destroyed, or was for any reason beyond the control of the company, no effort was made to show the fact. We think this default, and the failure of the railway company to explain it, warranted the assumption that the company had possession of the plat, and could have produced it had it so elected, and that its failure and refusal to do so warranted the further inference that the plat supported the city's case, or at least did not support the company's defense.

[12] Upon the company's refusal to produce the plat in question, the city offered what purported to be a copy thereof. This copy comes up with the record in the cause, and is before this court for inspection. Its physical texture and condition gives indubitable evidence of its great age and long years of service. It does not purport to bear the signature of Twohig, although the original was supposed to be indorsed with his signature. It bears the indorsement, "A copy from E. A. Giraud's map, scale 150 feet to inch. Made May 14, 1884. [Signed] Nicholas Luginsky," whose identity was not disclosed upon the trial. Although this copy does not purport to have been filed or recorded in the county records, the undisputed evidence showed that it had been in constant use in the county clerk's office from as far back, at least, as 1894, up to the present; that during all that time all conveyances of property located in the city were made by reference to this plat, and this was the only map of the city ever used by the public for such purpose. The introduction of this copy was objected to in detail by the railway company because of its lack of apparent authenticity, because it was not shown to have been published by Twohig or the company, or by them authorized to be placed in the clerk's office or to be recorded and was not found in that office until after Twohig's death, which occurred in 1891. These objections were overruled, and the map put in evidence. We

249 S.W.—18

do not think, under the facts disclosed, that the court abused its rather wide discretion in admitting this plat, or copy. Its accuracy in any detail was not challenged, and for all practical purposes and for many years it had served every use of an official map, and was undoubtedly the best evidence obtainable, in view of the absence of the original, which appellant alone could, but did not, explain. Spencer v. Levy (Tex. Civ. App.) 173 S. W. 554; City of Houston v. Finnigan (Tex. Civ. App.) 85 S. W. 471; Heard v. Connor (Tex. Civ. App.) 84 S. W. 605. Appellant's eighth assignment of error is overruled.

[13] Objection was also made by appellant to the introduction of a copy, or blueprint, of a station map alleged to have been made for and at the instance of appellant. It is unnecessary to discuss this transaction. The evidence was cumulative of all of appellee's evidence, and of the evidence disclosed in the old map mentioned, and, if its admission was error, it could not have injured appellant. The ninth assignment is overruled.

[14] By its tenth assignment of error appellant complains of the refusal of the court to allow damages for improvements which appellant alleges it constructed in good faith upon the dedicated premises. As the dedication of the premises in question were made by Twohig in the deed to and contracts with the railway company, and upon the map made for and in the possession of the company, the latter necessarily knew, or was charged with the knowledge, that, when the necessity or duty arose requiring the use of those premises by the public, the municipality would take possession, we do not understand that appellant can recover for the improvements it erected upon those premises. Besides, the improvements placed on the land by the railway company did not serve to enhance the value of that land for the purposes of the public, and the reason upon which such allowance is ordinarily made does not exist in the case. Grigsby v. Peak, 68 Tex. 235, 4 S. W. 474, 2 Am. St. Rep. 487; City of Victoria v. Victoria County, 103 Tex. 477, 128 S. W. 109, 129 S. W. 593. The depot and warehouse placed by appellant in Main street were largely destroyed by fire in 1916, and had not been replaced except by temporary frame structures, and the loss of these improvements, or the cost of removing them to another site, will work no serious hardship upon appellant.

We have given the appeal the most painstaking consideration, and, while the disposition of the cause in the court below may, as appellant contends, harshly disrupt the arrangement and location of the railway company's facilities at this highly important terminal, we cannot say that the judgment is erroneous, and it will, therefore, be affirmed.